**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TREVOR VANLOAN,** | : | **Civil No.  1:21-CV-1916** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **KILOLO KIJAKAZI**, | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant** | : | |

**<u>MEMORANDUM OPINION</u>**

**I.    <u>Introduction</u>**

The Supreme Court has underscored for us the limited scope of our

substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; <u>see, e.g.</u>, <u>Perales</u>, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S. Ct. 206. <u>See</u> <u>Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999)

(comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

Trevor VanLoan applied for supplemental security income under Title XVI of the Social Security Act on July 30, 2019, alleging an onset date of disability of July 27, 2014. The record reveals that VanLoan, who is in his early 20's and has no relevant work history, alleged that he was totally and permanently disabled as of his eighteenth birthday. A hearing was held before an Administrative Law Judge ("ALJ"), and the ALJ found that VanLoan was not disabled during the relevant period and denied VanLoan's application for benefits. VanLoan now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence.

However, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

## II.   **Statement of Facts and of the Case**

VanLoan filed his claim for supplemental security income on July 30, 2019, alleging an onset date of July 27, 2014, his eighteenth birthday. (Tr. 15). VanLoan alleged disability due to bipolar disorder, severe attention deficit hyperactivity

disorder (ADHD), and a learning disability. (Tr. 64). He was 23 years old at the time he filed his application, had a 12th grade education, and had no past relevant work experience. (Tr. 28).

Prior to the relevant time period, the medical evidence established that VanLoan was diagnosed with ADHD and oppositional defiance disorder in 2002 when he was in the first grade. (Tr. 371). It was noted that VanLoan was evaluated due to hyperactivity, inattention, and impulsive behavior both at home and at school. (Id.) VanLoan was evaluated by Dr. Suresh Undavia, M.D., in December of 2011 and underwent a psychiatric evaluation. (Tr. 406). VanLoan's mother who accompanied him to the evaluation reported that VanLoan had been kicked out of school twice, that he had behavioral issues, and that he needed to be reminded to do routine things such as take out the trash. (Id.) During the assessment, it was noted that VanLoan's mood was anxious and mildly depressed but not of a significant nature; that his eye contact was shifting, and he was not attentive but was cooperative; and his affect was adequate and appropriate. (Tr. 406-07). Dr. Undavia diagnosed him with ADHD and changed his medications. (Tr. 407). Treatment notes from Dr. Undavia from January 2012 indicated that VanLoan was much calmer, and that he and his mother expressed that the medication was helping. (Tr. 409).

At a follow up appointment with Dr. Undavia in April of 2012, VanLoan's mother reported that he was having trouble in school and with a girlfriend. (Tr. 410). Dr. Undavia prescribed him Wellbutrin for his ADHD. (Id.) In July 2012, it was reported that VanLoan had done well in school that year, but that there were degrees of explosivity or aggressivity after school. (Tr. 411). Dr. Undavia made some adjustments to his medication, and overall noted that he looked mature, was calmer, and had ended the relationship with which he was having trouble. (Id.) At a follow up psychotherapy session in October 2012, Dr. Undavia reported that "a lot of things are better" but that he was not getting along with a teacher. (Tr. 412). Dr. Undavia noted that he was stable on his medications, and that he had progressed quite well. (Id.) However, in November 2012, VanLoan was taken to the hospital after expressing suicidal ideation, which appeared to have some relation to a friend of his who had committed suicide in the past. (Tr. 413). He voluntarily entered into a behavioral science unit, where he participated in a treatment program and was discharged. (Tr. 414) VanLoan treated with Dr. Undavia in March of 2013, and treatment notes indicated that his school performance was not good, but that his "defiance seems to be basically [] adolescent behavior, which mother cannot accept." (Tr. 417). Dr. Undavia made a change to the medication, as VanLoan reported feeling sleepy in school. (Id.)

4

In his senior year of high school, VanLoan was placed in an Individualized Education Program (IEP) due to a learning disability in written expression. (Tr. 267-68). It was noted that VanLoan had employment aspirations after high school and indicated an interest in game conservation or hunting, as well as a career in construction. (Tr. 270). At that time in 2013, VanLoan indicated that he enjoyed hanging out with friends and riding four wheelers, as well as hunting and fishing. (Id.)

There is a significant gap in the VanLoan's treatment history as the medical record then jumps to April of 2017, when VanLoan was brought to the hospital by police officers after threatening his mother and significant other. (Tr. 380). VanLoan reported that he had been off of his medications for one to two months at that time. (Id.) Treatment notes indicate that VanLoan and his fiancé, who was pregnant at the time, had gotten into a fight when she accused him of being unfaithful. (Tr. 386). VanLoan reported a history of mood swings and impulsivity, although he had never physically assaulted anyone but did have a history of arson. (Id.) A mental status examination indicated that VanLoan was oriented to person, place, and time, his mood was anxious and depressed, his thought process was linear and goal-directed, and his insight and judgment were limited. (Tr. 387). He was diagnosed with bipolar

1 disorder, cannabis abuse disorder, and ADHD. (Tr. 385). The hospital was able to stabilize his mood, and he was stable upon discharge. (Id.)

In March of 2018, VanLoan treated with Dr. Undavia, and it was noted that the gap in treatment was due to lack of insurance between 2013 and 2018. (Tr. 420). Dr. Undavia reported that there was "no paranoia and there is no manic behavior, it is clear cut substance abuse of various type including cannabis, alcohol, cocaine, and crystal meth," and Dr. Undavia opined that VanLoan was suffering from severe drug addiction. (Id.) Thus, on March 16, 2018, VanLoan was admitted to Inpatient New Horizons for cannabis dependence, and it was reported that he voluntarily entered drug treatment rather than go to drug court. (Tr. 378).

At a follow-up visit in June of 2018, VanLoan reported improvement regarding his substance abuse, but that his agitation, irritability, and bipolar disorder were ongoing and were moderate in severity. (Tr. 422). On examination, VanLoan was cooperative, his associative thinking was intact, and his thought process appeared clear and appropriate. (Id.) Dr. Undavia placed VanLoan on Invega for his bipolar disorder. (Id.) During a psychiatric assessment, VanLoan reported that he was on probation. (Tr. 424). It was noted that VanLoan spoke nonchalantly about his problems and made light of things, including his behavior, anger, and fits of rage and hostility. (Tr. 425). Dr. Undavia opined that VanLoan was dealing with a

combination of bipolar disorder, ADHD, and drug addiction. (Id.) She proposed that he take Invega and eventually Invega injections since he had periods of medication noncompliance, to which he agreed. (Id.)

By August of 2018, VanLoan's ADHD and bipolar symptoms had improved and his agitation was less frequent. (Tr. 431). He reported that his medication had only worked for a short period, so Dr. Undavia increased his dosage. (Id.) On September 6, 2018, Dr. Undavia opined that VanLoan was not employable then or in the future due to his mental impairments. (Tr. 433). Dr. Undavia stated that they were still in the process of adjusting his medications, and that it could take between three to six months. (Id.) However, treatment notes from Dr. Undavia at this time indicate that VanLoan's mental impairments were improving. (Tr. 434). Notably, VanLoan remarked that he was "better than [he] ha[d] ever been" at this time. (Tr. 436). Indeed, Dr. Undavia noted that he was much less angry and irritable. (Id.) VanLoan was compliant with his medications, and it was noted that he was not on medication for ADHD at that time. (Tr. 437-39).

Between November of 2018 and January of 2019, treatment notes from Dr. Undavia were largely unremarkable. (Tr. 440-45). VanLoan's mental status evaluations revealed a cooperative attitude, normal mood and affect, clear speech and thought process, and he was fully oriented. (Id.) He continued to receive Invega

7

injections to manage his bipolar disorder. (Id.) In January of 2019, VanLoan reported that he was "o.k.," and he was continuing his Invega injections. (Tr. 444-45).

In March of 2019, VanLoan underwent a psychiatric evaluation by Amanda Slowick, Psy.D. (Tr. 449-54). Dr. Slowick indicated that VanLoan had trouble sleeping and had gained weight since starting Invega. (Tr. 449). He indicated that his mood was stable on his medication but admitted his history of anger management problems. (Id.) It was noted that VanLoan had recently worked at a stone quarry, but that he was discharged when he was facing potential prison time. (Tr. 449). On examination, VanLoan's appearance was appropriate; his speech was fluent; his thought processes were coherent and goal-directed; his mood was euthymic; his attention and concentration were mildly impaired; his insight was limited; and his judgment was questionable. (Tr. 450-51). VanLoan reported that he was able to dress and bathe himself, cook food, do household chores, go grocery shopping, and spend time with friends. (Tr. 451). Dr. Slowick opined that VanLoan was mildly limited in his ability to understand, remember, or apply complex directions and instructions, use reason and judgment to make work-related decisions, and sustain concentration and an ordinary routine. (Tr. 452). She further opined that VanLoan was moderately limited in his ability to interact with others, due to his distractibility and anger. (Id.)

8

VanLoan continued to treat with Dr. Undavia, and treatment notes from May of 2019 indicate that he was having more frequent anger outbursts and agitation. (Tr. 537). Dr. Undavia noted that VanLoan's insurance was not covering Invega, and VanLoan was switched to Prolixin instead. (Tr. 538). At the next session in June 2019, Dr. Undavia's notes state that VanLoan went downhill after the medication alteration. (Tr. 539). It was noted that VanLoan was depressed, aggressive, and not caring for his children. (Id.) Dr. Undavia put VanLoan back on Invega. (Tr. 540). After starting Invega treatments, VanLoan's bipolar disorder was noted to be improving. (Tr. 543, 545, 547, 553, 555, 557, 559, 561, 565, 567). Further, his mental status examinations were largely unremarkable, indicating clear speech, normal mood, clear and appropriate thought processes, grossly intact memory, attention span, and concentration, as well as grossly intact impulse control. (Id.)

In December of 2019, Dr. Roger Fretz, Ph.D., a state agency consultant, examined the record and opined that VanLoan had only mild limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 69). Dr. Fretz further opined that the statements regarding VanLoan's interpersonal functions, stress tolerance, and memory and concentration were

partially consistent with the medical evidence of record, but ultimately opined that there was no evidence of moderate to severe difficulty in any domain. (Id.)

Dr. Melissa Franks, Psy.D, opined in July of 2020 that VanLoan had a moderate limitation in concentrating, persisting, or maintaining pace, but that he had only a mild limitation in the other areas of functioning. (Tr. 79). Dr. Franks opined that the medical record did not support the presence of a mental health impairment aside from substance abuse. (Id.) She further opined that VanLoan could perform tasks within a schedule at a consistent pace, make simple decisions, and maintain regular attendance. (Tr. 81).

Dr. Undavia filled out a mental health questionnaire on September 23, 2020, and a revised first page of this questionnaire on November 2, 2020. (Tr. 576-77, 582). Dr. Undavia opined that VanLoan had an extreme limitation in maintaining attention and concentration; a marked limitation in maintaining regular attendance; a marked limitation in his ability to interact appropriately with the general public; extreme limitations in accepting instructions and getting along with coworkers; and an extreme limitation in his ability to respond appropriately to stressors in the workplace. (Tr. 582). Dr. Undavia further opined that VanLoan would be off task more than 33% of the workday and would be absent three or more days per month. (Tr. 577). Further, on February 3, 2021, Dr. Undavia filled out a drug and alcohol

questionnaire, in which Dr. Undavia opined that VanLoan lacks insight and motivation. (Tr. 588). Dr. Undavia further stated the opinion that VanLoan "is disabled for life due to his bipolar disorder." (Id.)

It is against this medical backdrop that the ALJ held a telephonic hearing on VanLoan's claim on January 25, 2021.  (Tr. 35-63). At the hearing, both VanLoan and a Vocational Expert testified. (Id.) By a decision dated April 5, 2021, the ALJ denied VanLoan's application for benefits. (Tr. 15-29).

In that decision, the ALJ first concluded that VanLoan had not engaged in any substantial gainful activity since his alleged onset date of July 27, 2014.  (Tr. 13). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that VanLoan had the following severe impairments: ADHD; specific learning disability in written expression; bipolar I disorder; intermittent explosive disorder; generalized anxiety disorder; and marijuana, stimulant, and alcohol abuse. (Tr. 18). At Step 3, the ALJ determined that VanLoan did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 18-20). On this score, the ALJ found that VanLoan had a mild limitation in understanding, remembering, or applying information, and moderate limitations in adapting or managing himself; concentrating, persisting, or maintaining pace; and in interacting with others. (Id.) Specifically regarding his

11

ability to interact with others, the ALJ noted that VanLoan alleged difficulty getting along with others, having anger issues and outbursts. (Tr. 19). However, the ALJ further noted that the medical evidence showed that these symptoms were controlled with medication, and his mental status examinations revealed that he was cooperative with a normal mood and intact impulse control. (Id.)

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity (RFC), considering VanLoan's limitations from his impairments:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: would be limited to work involve only simple, routine tasks, but not at a production rate pace; limited to no more than simple work-related decisions; could tolerate no more than occasional changes in the work setting; and limited to occasional interaction with supervisors, co-workers, and the public.

(Tr. 20).

Specifically, in making the RFC determination, the ALJ considered the medical evidence, medical opinions, and VanLoan' testimony regarding his impairments. On this score, the ALJ considered the opinions of the state agency consultants, Dr. Fretz and Dr. Franks. (Tr. 25-30). The ALJ found Dr. Franks' opinion regarding a moderate limitation in concentration, persistence, and pace to be somewhat persuasive, as this opinion was consistent with the evidence that was available at the time of review. (Id.) The ALJ found less persuasive the opinion of

Dr. Fretz, reasoning that this opinion was not supported by the medical evidence of record, as Dr. Fretz opined that VanLoan's mental impairments were not severe. (Id.) Further the ALJ noted that the totality of the evidence in the record supported additional limitations, in that VanLoan had moderate limitations in adapting and managing oneself as well as interacting with others. (Tr. 26).

The ALJ also considered the psychiatric evaluation of Dr. Slowick and found this opinion somewhat persuasive. (Id.) The ALJ reasoned that Dr. Slowick's opinion was somewhat consistent with her own evaluation, but that the opinion was not based on the record in its entirety. (Id.) The ALJ ultimately found that the medical evidence of record, including VanLoan's testimony, supported somewhat greater limitations.

Finally, the ALJ considered the questionnaires completed by Dr. Undavia, VanLoan's treating physician. (Tr. 26-27). On this score, the ALJ considered Dr. Undavia's September 6, 2018 letter indicating that the plaintiff's mental health issues interfered with his day-to-day functioning, and that VanLoan was not employable. (Tr. 26). The ALJ noted that issues of employability and disability are issues reserved for the Commissioner, and further, that this statement was inconsistent with Dr. Undavia's clinical findings. As to the medical source statement completed by Dr. Undavia in September of 2020, the ALJ found this statement

unpersuasive. (Tr. 26-27). The ALJ reasoned that Dr. Undavia's opinion including extreme and marked limitations in areas of functioning were not consistent with Dr. Undavia's treatment notes, which documented VanLoan's bipolar disorder as largely stable on medications. (Id.) Further, the ALJ noted the largely unremarkable mental status examinations contained in Dr. Undavia's treatment records. (Tr. 27). Finally, as to the drug and alcohol questionnaire completed by Dr. Undavia, which included a statement that VanLoan was disabled for his lifetime, the ALJ similarly found this statement unpersuasive as it was inconsistent with the treatment records and the medical evidence as a whole. (Id.)

The ALJ also considered VanLoan' testimony. VanLoan testified that he is often unable to control his anger, and that he needed reminders to complete routine tasks and personal hygiene. (Tr. 21). He stated that he cannot pay attention for long periods of time, and that he does not finish what he starts. (Id.) VanLoan further testified that his bipolar disorder and anxiety made it hard to focus, and thus, he could not work. (Id.) He noted that his parents would help him when he had custody of his kids on the weekends, and that he did not have any hobbies and sat home alone in his thoughts. (Id.) He reported difficulty getting along with others, and that he becomes angry if someone looks at him the wrong way. (Id.) He admitted to using marijuana to calm his anxiety, and that he drinks alcohol. (Id.)

The ALJ ultimately found that VanLoan' statements were not consistent with the medical evidence of record. (Tr. 21-25). On this score, the ALJ noted that while he had issues focusing in school, reports indicate that he was mostly polite to staff and his peers, and VanLoan reported hanging out with friends. (Tr. 22). The ALJ further noted that after returning to treatment with Dr. Undavia in 2018, VanLoan was admitted for cannabis dependence but left the treatment facility against medical advice, although he testified that he completed his rehabilitation program. (Id.) The ALJ reasoned that Dr. Undavia's treatment notes reflected stability of the bipolar disorder when VanLoan was compliant with his medications, noting as well the period of time that VanLoan's insurance did not cover the Invega treatments. (Tr. 23). Ultimately, the ALJ concluded that VanLoan was not as limited as he alleged.

Having arrived at this RFC assessment, the ALJ found at Step 4 that VanLoan had no past relevant work. (Tr. 28). The ALJ then made a finding at Step 5 that VanLoan could perform work available in the national economy as a vehicle cleaner, a janitor, or a laundry worker. (Tr. 29). Accordingly, the ALJ concluded that VanLoan did not meet the stringent standard for disability set by the Act and denied his claim. (Id.)

This appeal followed. (Doc. 1). On appeal, VanLoan contends that the ALJ erred in assessing the opinion of Dr. Undavia, the plaintiff's treating psychiatrist,

and in formulating the RFC assessment. This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III.   Discussion

### A.   Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two

16

inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." <u>Leslie v. Barnhart</u>, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid</u>.; <u>see, e.g., Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek</u>, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is

supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his

decision." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000).

As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. <u>Id</u>. at 120; <u>see Jones v. Barnhart</u>, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

**B.      Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); <u>see also</u> 20 C.F.R. §404.1505(a).  To satisfy this requirement, a claimant must have a severe

physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of

20

the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a

physician is misguided." <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. <u>Biller</u>, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. <u>See Titterington v. Barnhart,</u> 174 F. App'x 6, 11 (3d Cir. 2006); <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if

it is supported by substantial evidence. <u>Burns v. Barnhart</u>, 312 F.3d 113, 129 (3d Cir. 2002); <u>see also Metzger v. Berryhill,</u> No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), <u>report and recommendation adopted sub nom. Metzgar v. Colvin</u>, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); <u>Rathbun v. Berryhill</u>, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory

23

explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id.</u> at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 433 (3d Cir. 1999).

This principle applies with particular force to legal challenges, like the claim made here, based upon alleged inadequacies in the articulation of a claimant's mental RFC. In <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, 212 (3d Cir. 2019), the United States Court of Appeals recently addressed the standards of articulation that apply in this setting. In <u>Hess,</u> the court of appeals considered the question of whether an RFC, which limited a claimant to simple tasks, adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that, "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate'

24

difficulties in 'concentration, persistence, or pace.'" <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the <u>Hess</u> decision are straightforward. In formulating a mental RFC, the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

### C.   <u>Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence</u>

The plaintiff filed this disability application in July of 2019 after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of

2017, the Commissioner's regulations governing medical opinions changed in a

number of fundamental ways. The range of opinions that ALJs were enjoined to

consider were broadened substantially, and the approach to evaluating opinions was

changed from a hierarchical form of review to a more holistic analysis. As one court

as aptly observed:

> The regulations regarding the evaluation of medical evidence have been
> amended for claims filed after March 27, 2017, and several of the prior
> Social Security Rulings, including SSR 96-2p, have been rescinded.
> According to the new regulations, the Commissioner "will no longer
> give any specific evidentiary weight to medical opinions; this includes
> giving controlling weight to any medical opinion." <u>Revisions to Rules</u>
> <u>Regarding the Evaluation of Medical Evidence</u> ("<u>Revisions to Rules</u>"),
> 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), <u>see</u>
> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner
> must consider all medical opinions and "evaluate their persuasiveness"
> based on the following five factors: supportability; consistency;
> relationship with the claimant; specialization; and "other factors." 20
> C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).
>
> Although the new regulations eliminate the perceived hierarchy of
> medical sources, deference to specific medical opinions, and assigning
> "weight" to a medical opinion, the ALJ must still "articulate how [he
> or she] considered the medical opinions" and "how persuasive [he or
> she] find[s] all of the medical opinions." <u>Id</u>. at §§ 404.1520c(a) and
> (b)(1), 416.920c(a) and (b)(1). The two "most important factors for
> determining the persuasiveness of medical opinions are consistency and
> supportability," which are the "same factors" that formed the
> foundation of the treating source rule. <u>Revisions to Rules</u>, 82 Fed. Reg.
> 5844-01 at 5853.
>
> An ALJ is specifically required to "explain how [he or she] considered
> the supportability and consistency factors" for a medical opinion. 20
> C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to

"supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence

for no reason or for the wrong reason.'" <u>Morales v. Apfel</u>, 225 F.3d 310, 317 (3d

Cir. 2000) (quoting <u>Mason</u>, 994 F.2d at 1066). Therefore, provided that the decision

is accompanied by an adequate, articulated rationale, it is the province and the duty

of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without
> crediting the entire opinion. <u>See</u> <u>Thackara v. Colvin</u>, No. 1:14–CV–
> 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015);
> <u>Turner v. Colvin</u>, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that
> "SSR 96–2p does not prohibit the ALJ from crediting some parts of a
> treating source's opinion and rejecting other portions"); <u>Connors v.
> Astrue</u>, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June
> 10, 2011). It follows that an ALJ can give partial credit to all medical
> opinions and can formulate an RFC based on different parts from the
> different medical opinions. <u>See e.g.</u>, <u>Thackara v. Colvin</u>, No. 1:14–CV–
> 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

<u>Durden v. Colvin</u>, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is

no evidence of any credible medical opinion supporting a claimant's allegations of

disability "the proposition that an ALJ must always base his RFC on a medical

opinion from a physician is misguided." <u>Cummings</u>, 129 F.Supp.3d at 214–15.

### D.   <u>The ALJ's Decision is Supported by Substantial Evidence.</u>

In this setting, we are mindful that we are not free to substitute our

independent assessment of the evidence for the ALJ's determinations. Rather, we

must simply ascertain whether the ALJ's decision is supported by substantial

evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, <u>Richardson</u>, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce</u>, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that VanLoan was not disabled. Therefore, we will affirm this decision.

VanLoan first challenges the ALJ's decision by arguing that the ALJ did not properly assess the opinion of Dr. Undavia, the plaintiff's treating psychiatrist who opined that VanLoan had marked to extreme limitations in various areas of functioning and stated that VanLoan was disabled for his lifetime. At the outset, we note that the question of disability is a legal determination and is not wholly dictated by medical opinions. Indeed, it is well settled that "[t]he ALJ–not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." <u>Chandler</u>, 667 F.3d at 361. Further, in making this assessment of medical opinion evidence, "[a]n ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion." <u>Durden</u>, 191 F.Supp.3d at 455. Finally, when there is no evidence of any credible medical opinion supporting a claimant's allegations of disability it is also well settled that "the

proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

Here, the ALJ explained that he found Dr. Undavia's statements and questionnaires unpersuasive. First, the ALJ noted that Dr. Undavia's marked and extreme limitations were not supported by the doctor's own treatment records, which showed that VanLoan's bipolar disorder was stable when he was medication complaint. Indeed, Dr. Undavia's records consistently indicate that VanLoan's bipolar disorder was improving, and that he was experiencing less frequent agitation and outbursts. Additionally, VanLoan's reported activities of daily living undercut the severity of Dr. Undavia's opinion that VanLoan was extremely limited in his ability to interact with others. The ALJ further reasoned that Dr. Undavia's mental status evaluations showed largely unremarkable findings, in that these examinations routinely revealed a normal mood and speech, coherent and goal-directed thought processes, orientation to person, place, and time, and intact judgment and insight. Accordingly, the ALJ found that Dr. Undavia's extreme limitations were not supported by the medical evidence of record. The ALJ also found the assessments of the state agency consultants partially persuasive, as these medical consultants opined that VanLoan could perform some work with certain nonexertional

limitations. The ALJ further considered VanLoan's testimony but concluded that his subjective complaints were not entirely consistent with the medical record.

On this score, the ALJ was confronted by several medical opinions, which including varying limitations based on the plaintiff's mental impairments. The ALJ considered all of these opinions against the objective medical evidence in the record and explained why some opinions were partially persuasive and why he found other opinions, including Dr. Undavia's, inconsistent with the medical evidence. The ALJ further considered the plaintiff's subjective complaints against the objective medical evidence and concluded that the evidence was not consistent with VanLoan's alleged level of limitation. We again note that "[t]he ALJ – not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Accordingly, we find that the ALJ considered all of the medical evidence and adequately explained his reasoning for the persuasiveness given to the various medical opinions in this case to determine the range of work VanLoan could perform.

In a similar vein, VanLoan argues that the ALJ's RFC assessment was not supported by any proper medical opinion. Specifically, VanLoan asserts that the ALJ limited him to occasional interaction with supervisors, coworkers, and the public, and that this limitation did not account for what the ALJ found to be a moderate

31

limitation in interacting with others. However, we have found an ALJ's limitation of a claimant to occasional interaction with others sufficient to account for a moderate limitation in this area of social functioning. See Eisenhart v. Kijakazi, 2021 WL 7285699, at *15-16 (M.D. Pa. Dec. 20, 2021) report and recommendation adopted 2022 WL 626780 (M.D. Pa. Mar. 3, 2022). See also Mangual-Alicea v. Kijakazi, 2022 WL 2373875, at *7 (E.D. Pa. April 19, 2022) ("Courts in this circuit have determined that 'occasional' or 'superficial' contact with supervisors, co-workers, or the public is adequate to reflect moderate limitations in social functioning") (collecting cases).

Moreover, as we have explained, the ALJ found Dr. Undavia's opinions unpersuasive and adequately explained the reasoning for this finding. Accordingly, the ALJ was not bound by Dr. Undavia's opinion that VanLoan had a marked to extreme limitation in interacting with others and had no obligation to include such a limitation in the RFC assessment. Thus, we find that substantial evidence supports the ALJ's RFC assessment in this case.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way

which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas, Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.  <u>Conclusion</u>

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.


*s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATE: October 14, 2022